IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SUSAN MELTON,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Case No. 05-3509-CV-S-NKL
                                       )
JO ANNE B. BARNHART                    )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## ORDER

Pending before the Court is Susan Melton's ("Melton") Motion for Summary

Judgment [Doc. # 7]. Melton seeks judicial review of the Commissioner's denial of her

request for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401,

*et seq.*

The complete facts and arguments are presented in the parties' briefs and will be

duplicated here only to the extent necessary. Following a review of the entire record, the

Court reverses the ALJ's decision and remands for a new determination of Melton's

Residual Functional Capacity ("RFC") that takes into account all of Melton's severe

impairments, including her migraine headaches, if they are found to be vocationally

relevant. If not, the ALJ should explain why. The ALJ is also required to provide a

narrative that explains how Melton's medical records or other evidence support the RFC

selected by the ALJ. In addition, if the ALJ again concludes that Melton is able to return

1

to her past job as a sander, the ALJ must identify the function by function requirements of a sander to verify that her credible limitations will not prevent her from doing the work of a sander. Finally, if the ALJ, at step five of the evaluation process, concludes that Melton is not disabled, the ALJ must not identify jobs in the economy which have requirements that are inconsistent with Melton's RFC.

I.    **Background**

Melton filed her application for disability benefits on July 31, 2002. She alleged an onset date of October 2, 2001, and she stated that her disabling impairments were severe bipolar disorder, depression and migraine headaches. Her past work experience included work as a licensed practical nurse, a cashier, a sander, and a waitress. She had most recently been working in the field of body piercing. (Tr. 329.)

A.    **Medical Background**

1.    *Miscellaneous Treatments for Depression and Bipolar Disorder*

Melton consulted with several doctors on various occasions related to her physical ailments, which included vomiting, abdominal pain, back pain, weight loss and gain, and diarrhea. The Court will not recount all of the medical evidence regarding these conditions because they are not related to the ailments Melton alleged in her disability application.

Melton was hospitalized for four days in December 1998 due to her psychological ailments. (Tr. 481-82.) She was diagnosed with bipolar disease with suicidal ideation. Her GAF upon admission was assessed at 40. During her hospitalization, Melton

2

underwent a clinical interview and some objective testing. The test results stated that she had a tendency to overreport psychopathology. (Tr. 478.) The results also reflected that she had anxiety and depression in addition to borderline personality disorder. At the time of her testing, Melton was assessed with a GAF of 65. (Tr. 479.) Upon discharge, Melton was diagnosed with major depression and her GAF was 80. (Tr. 460.)

Melton reported to Cox Health Systems for treatment. In October 2000, she was diagnosed with bipolar disorder. (Tr. 159.) In March 2001, she was diagnosed with insomnia and personality disorder. (Tr. 155-56.)

Melton reported to Dr. Bartlett and he treated her for various physical conditions. In January 2002, Dr. Bartlett noted that Melton's mood and affect were slightly depressed. (Tr. 179-80 and 177.) Dr. Bartlett diagnosed Melton with depression in January 2002. (Tr. 177.) On January 26, 2002, Melton underwent an MRI. With the exception of a single focus of an increased signal in her frontal lobe, the MRI was within normal limits. (Tr. 185.)

Melton was also treated by physicians at the Ozarks Medical Center. On March 25, 2002, Melton reported vomiting and significant weight loss. Dr. Kendell Clarkston stated that Melton's weight loss may be due to her underlying mental illness. Dr. Clarkston diagnosed Melton with bipolar depression and possible peripheral adenopathy. (Tr. 216-18.)

As part of her treatment at the Ozarks Medical Center, Melton also consulted with Dr. Arifa Salam. According to Dr. Salam, Melton's psychomotor activity appeared

retarded.  (Tr. 208-09.)  Her insight appeared artificial and her judgment had some

limitations.  Dr. Salam diagnosed her with bipolar disorder type II and cluster B

personality disorder.  He assessed her GAF at 50-55.  Dr. Salam recommended that

Melton see a therapist in outpatient therapy.

Melton also received treatment at the Texas County Memorial Hospital.  In

December 2001, Melton's affect was flat.  She reported that she was agitated and she had

gotten little sleep for the previous two days.  Melton was tearful during the interview.

(Tr. 247-48.)  In May 2002, Melton complained again about problems with migraines and

bipolar disorder.  (Tr. 236.)

Dr. Doyle Hill treated Melton over several months for back pain and headaches.

In December 2002, Dr. Hill diagnosed Melton with depression.  (Tr. 258.)  In January

2004, Dr. Hill diagnosed Melton with depression and bipolar disorder.  (Tr. 415, 411.)

### 2.    *OMC Behavioral Health Care*

On September 13, 2000, Melton reported that she was doing pretty well, but that

she wanted to increase her lithium prescription so she could reduce her other prescription.

She was diagnosed with bipolar II disorder.  (Tr. 353.)  She was considered to be

clinically stable as she denied being suicidal and she was not psychotic.  Dr. Thomas

Thomas noted that Melton was in "a better mood than I have seen her in most of our

previous sessions."  (Tr. 353.)

At some point in her treatment regimen, Melton was prescribed Trazodone.  On

October 25, 2000, Melton reported that her Trazodone was causing her bad dreams.  (Tr.

4

352.)  Her physician stated that her pharmacotherapy was stable and that clinically she was pretty stable.  Melton was not suicidal, her behavior was appropriate, and she was alert and oriented.  She denied hallucinations.

In May 2001, Melton was working nights and she reported that she had increased anxiety and more trouble sleeping.  Melton reported that she was able to do her daily activities of living and that she was starting to enjoy her job.  Overall, she stated that her mood was fairly good, but she was irritated because of the lack of sleep.  She was diagnosed with bipolar disorder and she was told to continue to take Trazodone and Benadryl at night.  (Tr. 350.)

In July 2001, Melton reported that she had stopped taking a lot of her medications.  (Tr. 349.)  She reported adjusting to her new job pretty well.  Melton stated that her mood was good, her appetite was good, and her energy level was better.  She was sleeping eight hours a night.  Melton reported that she could perform her daily activities of living and she was "enjoying life."  (Tr. 349.)  She denied racing thoughts, suicidal thoughts, or hallucinations.

In August 2001, Melton reported that she was waking up several times a night.  Her energy level was "fair" and her appetite was okay.  (Tr. 348.)  She had recently lost her job, but she was still able to perform her daily activities of living.  Melton was well-groomed.  She was diagnosed with bipolar disorder noting a recent increase in her depressive symptoms.  (Tr. 348.)  She was prescribed Effexor XR and told to continue taking her other medications, which included ReVia, Zyprexa, Trazodone, and Topamax.

5

In October 2001, Melton stated that she was sleeping eight to ten hours a night, even though the Trazodone continued to cause bad dreams. (Tr. 347.) Melton reported irritability because of her children and decreased motivation, but she stated that her mood was "fairly good." (Tr. 347.) Her energy level was good and she denied any suicidal or racing thoughts. Melton had obtained new employment and she was enjoying her new job. She was diagnosed with bipolar disorder and she was told to increase her prescription of Toprol.

In November 2001, Melton reported that she was having problems at her job at a nursing home because of an investigation into her nursing license. (Tr. 346.) She stated that she was doing well prior to the events at the nursing home. She was sleeping quite a bit, although she had trouble sleeping the few days before her appointment. Melton was well groomed and she had a "fairly logical flow of thought." (Tr. 346.) Her speech did not have " a pressured quality." Melton's affect was blunted. (Tr. 346.)

In January 2002, Melton reported stomach problems because she was unable to keep her medications down. (Tr. 345.) She was sleeping six to seven hours a night and her appetite was reduced. Melton reported a low energy level and she denied suicidal or racing thoughts. Melton stated that she "kind of struggles" to do her activities of daily living. (Tr. 345.) She was well groomed and she exhibited "no unusual behaviors or mannerisms." (Tr. 345.) Melton's affect was flatter than usual.

At a subsequent appointment in late January 2002, Melton stated that she was sleeping five hours a night and she was a little bit tired, although she was not napping

during the day.  (Tr. 344.)  She reported feeling "really up and very positive."  (Tr. 344.)
She was having fewer problems with nausea and she was eating one meal a day--her
medical doctor was satisfied with her dietary intake.  Her energy level was low, but she
was able to perform her activities of daily living with assistance from her children.  She
denied anxiety or panic symptoms and she was not suffering from suicidal or racing
thoughts.  Melton's affect was bright and she was well groomed.

At her appointment in February 2002, Melton discussed her work-related stress
surrounding her nursing license as well as discipline problems she was having with her
son.  (Tr. 343.)  Regarding these conflicts in her life, the clinician noted that Melton
"seems to have developed assertiveness skills to help deal with her problems."  (Tr. 343.)
Because of her ability to be assertive and her reliance on her religious faith, the clinician
stated that Melton's "progress towards her treatment goals appear[ed] to be good."  (Tr.
343.)

At her appointment in March 2002, Melton reported sleeping about five hours a
night with a nap during the day.  (Tr. 342.)  She was in a "very good" mood and her
energy level was high.  She denied racing or suicidal thoughts and she stated that she was
"enjoying life."  Melton's affect was bright and she was well groomed.  However, Melton
demonstrated pressured speech and flight of ideas.  She was diagnosed with bipolar
disorder with slight hypomanic symptoms.

At a subsequent appointment in later March 2002, Melton was well-dressed and
neat when she arrived for her therapy session.  (Tr. 341.)  Melton reported stress related

to her children and a recent change in her residence. Her new boyfriend smoked marijuana and drank alcohol; because of Melton's history with substance abuse, the clinician warned her about her "high risk" behavior.

In April 2002, Melton reported that she felt rested even though she was sleeping only five hours a night. (Tr. 340.) She stated that her mood was "pretty good," her appetite had increased, and that her energy level had improved. She reported being able to do her activities of daily living and she was "enjoying life." Melton reported that the state was not going to take action against her nurse's license. Melton's affect was bright, she was well-groomed, she maintained a logical flow of thought, and she maintained eye contact.

In May 2002, Melton's appearance was neat. (Tr. 338.) She reported that the state did not intend to take action against her nursing license, but that she still wanted to pursue a lawsuit. Melton and her clinician spent most of the session forming a more extensive treatment plan about how to deal with her children, mother, and reduce her depressive symptoms.

Melton returned in June 2002. (Tr. 337.) She reported sleeping only a few hours a night, but that she was not tired. Her mood was good and her energy level was high. Melton stated that she could perform her activities of daily living and she denied anxiousness or suicidal thoughts. She reported that if she is tired she "sees things and hears voices." (Tr. 337.) Melton was very well groomed, but she was observed to be overly bright and somewhat hypervigilant. She maintained eye contact. Melton stated

that she understood the need for sleep to regulate her bipolar disorder and she would attempt to sleep more.

On July 10, 2002, Melton stated that she was sleeping eight hours a day. She thought her mood was okay, her appetite was all right, and her energy level was medium. (Tr. 336.) Melton reported an increase in her anxiousness and that she was having problems with concentrating, but she denied racing thoughts. (Tr. 336.) Melton's speech was not pressured and she did not have any flight of ideas. She maintained eye contact. Melton reported that she had quit her job and taken a new job doing body piercing. She reported being stressed over financial problems. She was diagnosed with bipolar disorder with an increase in anxiety symptoms. Melton's prescription of Effexor was increased.

Melton returned on July 24, 2002, and reported significantly more problems with her children since the last appointment. (Tr. 335.) She was more tearful and she reported that she wanted to sleep all of the time. Her appetite had increased and her energy level was low. She stated that she had a reduced ability to "do her activities of daily living." (Tr. 335.) Melton reported having some fleeting suicidal thoughts, but she had not formulated a plan. She appeared anxious during the interview. She was diagnosed with bipolar disorder with an increase in her depressive symptoms.

On July 31, 2002, Melton reported sleeping a lot, as much as twelve hours per day. Her appetite fluctuated and her energy level was low. Melton stated that she was anxious and she was bathing every other day. Melton's affect was depressed and her Effexor prescription was increased. (Tr. 334.)

9

On September 12, 2002, Melton participated in her first group therapy session. (Tr. 333.) She had appropriate grooming and hygiene and she arrived on time. Her mood was normal and her affect was "primarily happy/cheerful." Melton reported having a positive response to the group and her input was "excellent." She "was able to give and receive constructive criticism to/from other group members and the group leader." She expressed an intention to continue participating in the group therapy sessions. She denied suicidal thoughts and her risk of harm to herself or others was low.

In September 2002, Melton underwent a psychosocial assessment. She had a flat affect and a depressed mood, but she did not show signs of anxiety and she was comfortable with the interview process. (Tr. 331.) Melton's appearance was disheveled and she had not groomed herself before the meeting, although she reported bathing and brushing her teeth every day. Melton reported doing her own shopping and her own cooking. Regarding her hobbies, Melton reported playing with her children, swimming, and going to the movies. Melton was diagnosed with bipolar II disorder, depression, and borderline personality disorder with cluster B traits. Her GAF was assessed at 51/60.

On October 1, 2002, Melton reported sleeping ten hours a night, but still needing naps during the daytime. (Tr. 324.) She stated that her energy level was low, but she reported doing her daily activities better than before. She was bathing every other day, she denied suicidal thoughts, and her thoughts were about normal speed. She was well-groomed for her appointment, she maintained eye contact, and she was "not quite as hypomanic as she ha[d] been." (Tr. 324.) Her flow of thought was "somewhat slowed."

10

A few days later, Melton again consulted for individual therapy with a new therapist--this was her first appointment with the new therapist. (Tr. 323.) She had appropriate grooming and hygiene. Her mood appeared to be sad and her affect was primarily sad. Melton's eye contact was pretty good. Melton appeared to have good self-esteem and self-confidence. She stated that she had made progress in treatment and she wanted to continue to make progress. Melton denied suicidal thoughts and her GAF was 61 to 63.

Melton participated in group therapy again on October 10, 2002. (Tr. 322.) Her grooming and hygiene were appropriate and her mood was normal. She participated in the group session and her contribution was "excellent." Melton was able to give and receive feedback and constructive criticism and she reported another positive experience. She denied suicidal thoughts.

On October 14, 2002, Dr. Jeff Farrow administered an MMPI-II for Melton. (Tr. 321.) Melton arrived for the testing on time and she was neat in her appearance. Her mood was mildly depressed and her affect was appropriate. Melton reported mild difficulty with her concentration and memory. During the administration of the examination, she did not experience delusional thought processes and she was able to read and verbalize the test contents. Her GAF was 50/60.

On October 17, 24, and 31, 2002, Melton again participated in group therapy. (Tr. 320, 319, 316.) Her participation level and her demeanor were consistent with her earlier group therapy sessions.

11

On October 29, 2002, Melton reported sleeping about five hours a night with a nap during the daytime. (Tr. 318.) She reported daily tearful episodes, but she stated that her medication was helping. She was not having problems performing her activities of daily living and her energy level was medium. Her affect was "a little more calm" than it had been, she maintained eye contact, and her flow of thought was "a little more logical." She denied suicidal thoughts.

At her appointment a few days later, Melton had appropriate grooming and hygiene. (Tr. 317.) Her mood appeared to be normal and her affect was "primarily happy/cheerful." Her eye contact was good. Her GAF was 61 to 63.

Melton returned to Dr. Farrow in November 2002. (Tr. 315.) She was mildly depressed and she reported that she was having ongoing difficulties with her sleep, appetite, energy level, concentration, and memory. Melton also claimed to be easily distracted and having mood swings. She was groomed and neat in appearance. Dr. Farrow stated that Melton's MMPI-II test results were invalid probably because she was overly anxious during the test's administration. Her GAF was 50 to 60.

On November 14, 2002, Melton reported that she was good and her mood appeared to be normal with a "primarily happy/cheerful" affect. Her eye contact was good and she had appropriate grooming and hygiene. (Tr. 313.) Melton's GAF was 58 to 60. Melton also participated in group therapy on November 14 and her participation was consistent with her earlier sessions. (Tr. 311.)

On November 22, 2002, Melton's mood and affect were normally variable. (Tr.

12

310.)  Melton stated that she believed her medication regimen was helping her maintain her consistent mood.  She denied suicidal thoughts and her GAF was 55 to 65.

On November 27, 2002, Melton reported that she was sleeping well, but that her energy level was volatile and her appetite had increased.  (Tr. 309.)  She reported that she experienced "rapid cycling of her moods."  She stated that she could perform her activities of daily living and that she bathed every two to three days.  She denied suicidal or racing thoughts.

In December 2002, Melton stated that she was sleeping for four-hour increments for a total of ten hours per day.  (Tr. 307.) Melton reported that her moods were volatile and that her energy level was low.  She stated she was bathing every two to three days. Melton reported that she had recently attempted suicide, but she did not require medical treatment.  Her affect was a little bit flat and depressed.  She appeared to be somewhat anxious and she was having trouble concentrating.  Melton was diagnosed with bipolar disorder with increased symptoms and she was re-started on lithium.

On January 27, 2003, Melton reported that she was feeling better on the lithium, although she was still experiencing minor mood swings.  (Tr. 306.)  She stated she was not as irritable and she felt like she was coping with her children better.  Her appetite was normal and her energy level was improving.  She reported diminished nervousness and she was not having panic attacks.  She denied suicidal thoughts and, although she reported racing thoughts, they had improved.  Her flow of thought was more logical and she was less anxious.  Melton was diagnosed with bipolar disorder with continued

13

symptoms.  Her lithium prescription was increased.

In March 2003, Dr. Farrow filled out a Disability Determination inquiry, which asked if Melton could perform work-related activities within a non-complex work environment and limited social contact on a full-time basis.  (Tr. 354.)  Dr. Farrow responded affirmatively that Melton could perform that work and Melton's counselor, Kevin Worthington, also signed the form signifying his agreement.

In May 2003, Melton reported showering only two to three times per week.  (Tr. 402.)  Her mood was depressed and she reported numerous mood swings.  She stated that she felt discouraged and a diminished appetite.  Melton was a little tearful during the interview and she appeared more depressed.  Melton was diagnosed with bipolar disorder with increased symptoms.  Her GAF was 55 to 65 and she denied any suicidal thoughts.

On May 21, 2003, Melton reported that she stopped taking her lithium as prescribed because she did not feel good when she took it.  (Tr. 402.) She reported volatile moods and feelings of discouragement.  Her appetite was diminished and her energy level was low.  She reported having racing thoughts at times.  Melton was a "little tearful" during the session and she appeared "a little bit depressed."  She was well-groomed.

In June 2003, Melton voluntarily stopped taking her Trezodone because she did not like its side effects.  (Tr. 401.)  She reported an unsteady appetite and feelings of anxiousness, but not panic attacks.  She bathed about three times a week and she denied suicidal thoughts.  Her affect was blunted and her thought process was slower than

normal. She was well groomed. Her prescription of Topamax was increased and she was started on Seroquel.

On June 25, 2003, Melton reported an inability to sleep, but she stated that her mood was better and her appetite was okay. (Tr. 400.) She felt a little bit tired and anxious, but she denied panic attacks. She was bathing about three times per week. Melton reported that she "enjoys life, but it bothers her than she can't take care of herself better." She denied suicidal thoughts or any side effects of her medicine. Her affect was a little bit depressed and she seemed a little anxious.

On July 1, 2003, Melton reported that she was feeling better after a recent change in her medications. (Tr. 399.) She reported some mood swings and some difficulty concentrating, but overall she felt like she had improved other than some problems caused by situational stressors. Her GAF was 50 to 60 with a reported mood of depression. She did not have suicidal thoughts and she was neat in her appearance.

On July 21, 2003, Melton's mood was mildly depressed and her affect was appropriate to content. (Tr. 397.) She reported mild depressive symptoms and continued problems with concentrating. She also reported some increased irritability. Her GAF was 55 to 65 and she was neat in her appearance.

On July 29, 2003, Melton reported that she was having more problems sleeping during the previous week. (Tr. 396.) She reported being irritable on occasion and lacking motivation to do anything other than watch television. She denied panic or anxiety attacks and she stated that she bathed about three times per week. She denied racing or

15

suicidal thoughts. Melton was well groomed, she maintained eye contact, and her flow of thought was logical.

On August 25, 2003, Melton reported sleeping ten to twelve hours per night and that her mood was "pretty even." (Tr. 395.) Her appetite was normal and her energy level was low. She was bathing every other day and she denied feeling anxious. She also denied racing or suicidal thoughts. Her affect was fairly bright and she was well groomed. Melton maintained eye contact, her flow of thought was logical, and she exhibited no pressured speech or flight of ideas.

The next day Melton denied increased irritability and she reported having no problems with her concentration. (Tr. 394.) She was frustrated that her medication caused her to gain weight and sleep a lot. She denied suicidal thoughts and her GAF was 55 to 65.

On September 22, 2003, Melton reported sleeping six hours a night. (Tr. 393.) She stated that her energy level was low and her appetite was medium. She reported feeling anxious and experiencing rapid cycling of her moods. She was bathing three times per week. Her affect was flat and her thought process was somewhat slowed.

On October 13, 2003, Melton's mood and affect were normal to variable. (Tr. 391.) She explained that she has increased irritability and she sometimes had difficulty with her concentration and memory. The session revolved primarily around Melton's living arrangements and her pursuit of disability benefits. Her GAF was 55 to 65.

On October 30, 2003, Melton reported that she was eating okay but that her energy

16

level was low.  (Tr. 390.)  She reported feeling anxious but she denied panic attacks.  She denied suicidal thoughts.  Melton reported bathing about once or twice a week.  Melton's affect was a little bit depressed, but she was well groomed and she maintained eye contact.

On November 17, 2003, Melton decreased her lithium dosage because she did not like its side effects.  (Tr. 388.)  She was sleeping about five hours per night.  She stated that her mood had improved since her recent medication change and she was not experiencing any depression.  Both her appetite and her energy level had improved.  She was bathing twice a week and she reported some feelings of anxiousness.  Nonetheless, she reported feeling more like her old self.  She did report hearing voices at night, but she was unsure if she was asleep or awake.  Melton's affect was less depressed than it had been and she joked during the session.  She was fairly well groomed.

On December 17, 2003, Melton reported sleeping four to five hours per night.  (Tr. 387.)  She described her mood as "great" and both her appetite and energy level had increased.  She was still experiencing anxiousness, but it had improved.  Melton had stopped taking her Wellbutrin medication.  She reported bathing every other day and she stated that she "enjoys life."  Melton and the clinician discussed the fact that her symptoms had been "relatively stable" except for a slight increase in her energy level.

On January 19, 2004, Melton reported sleeping three to four hours per night.  (Tr. 386.)  She described her mood as "blah."  She stated that her appetite was okay, but she was concerned about weight gain.  Melton reported that her energy level fluctuated and

17

that she had experienced panic attacks. She denied suicidal thoughts. Melton's affect was a little depressed, but she exhibited no pressured speech or flight of ideas.

On February 11, 2004, Melton consulted with a psychiatrist to discuss her symptoms of anxiousness. (Tr. 385.) She reported that she temporarily had to stop taking her medications because she had the stomach flu. After she started retaking her lithium and Valium, she reported feeling a lot better. Melton denied having depression, being suicidal, or experiencing hallucinations. Her energy level had increased and she was able to cook and do the laundry. According to the psychiatrist, Melton's vital parameters were stable, she was neatly groomed, and her speech was normal, although it was a little slow. Her mood was not depressed and her affect was mildly restricted. Melton's thought process was coherent and her insight and judgment were fair. Her cognition was grossly intact.

### 3. *Migraines*

Melton was also treated for migraine headaches on a few occasions. She complained about migraine headache pain in May 2002 (Tr. 236) and again in August 2003. (Tr. 436.) In the latter visit, she was diagnosed with having migraine headaches.

### B. The Hearing

### 1. *Melton's Testimony*

The ALJ conducted a hearing on April 20, 2004. Melton testified at the hearing that she could not work due to bipolar disorder. She stated that when she was manic, she would not sleep and she became violent with other people. She also testified about

18

auditory hallucinations when she is manic.  (Tr. 52.)  She testified that when she is manic,

she must have supervision and this occurs at least once a month.

When she is in a depressive stage of her bipolar, Melton testified that she sleeps all

the time and she cries.  She states that she is suicidal during this time and she needs help

with her hygiene.  (Tr. 54.)

Melton testified she suffered from bipolar for eight years and that she had lost jobs

because of her condition.  (Tr. 55.)

Regarding her migraine headaches, Melton stated that she suffered from a

migraine headache at least once a week and that it made her sensitive to light and sound.

(Tr. 56-57.)  She stated that her medication did not help her migraine headaches.

Melton testified about her physical impairments as well, but they are not the

subject of her pending Motion.  Therefore, the Court will not recount them herein.

Regarding her daily activities, Melton stated that she needs help with household

chores from her children.  She testified that they do all the vacuuming, mopping, dusting,

and sweeping.  (Tr. 61.)  She occasionally does laundry and she will cook a few times a

week.  When she cooks, she needs to take breaks.  She does not make beds.

### 2.    *Vocational Expert*

The ALJ called a vocational expert ("VE") to testify at the hearing.  The VE

identified Melton's past work as a sander, which she classified as light, unskilled work.

(Tr. 76.)  The ALJ asked the VE to assume a person of Melton's age with the same

educational and work background.  The ALJ posited the following hypothetical:

Assume that this person does not have any exertional limitations, but needs to avoid high stress work. By that I mean to eliminate fast-paced activity or work involving explicit production quotas, deadlines, schedules or changing work settings. Assume that the person's concentration would be limited in that the person could not sustain a high level of concentration. Not sustain precision or attention to detail, but in this hypothetical, we will assume that this person can pay attention well enough to sustain a simple, routine, or repetitive task. The person should avoid frequent or prolonged personal interaction with coworkers and the public--and the public. With those limitations, would that person be able to perform any past relevant work?

(Tr. 75-76.) The VE responded that the individual with the above limitations could perform work as a sander, with those jobs existing in a substantial number in the national economy. (Tr. 76.) In addition to work as a sander, this individual could perform some other unskilled work. (Tr. 76.)

Assuming the hypothetical remained the same in all other aspects, the ALJ altered the above hypothetical so that individual in question could not "maintain concentration even for a simple, routine, or repetitive task, and on a daily basis, a person is off-task for some period of time at least once until someone notice and redirects the person." (Tr. 76-77.) The VE testified that such a change in the hypothetical would render the individual unable to work.

Similarly, if the individual in the hypothetical had frequent interruptions in their work, such as two episodes of irrational behavior per month, the VE testified that individual would be precluded from all available work. (Tr. 77-78.)

### C. The ALJ's Decision

The ALJ found that Melton had the following severe impairments: bipolar

disorder, migraine headaches, and personality disorder.  (Tr. 24.)  The ALJ found that

Melton's psychological impairments "mildly restrict activities of daily living, moderately

limit her in maintaining social functioning, and cause moderate deficiencies of

concentration, persistence, or pace resulting in failure to complete tasks in a timely

manner."  (Tr. 21.)

The ALJ noted that the mental requirements for unskilled work were "the ability to

understand, remember, and carry out simple instructions; make simple work-related

decisions; respond appropriately to supervision, co-workers, and usual work situations;

and deal with changes in a routine work setting."  (Tr. 23.)  The ALJ found that Melton

could satisfy these requirements even with her conditions and, because she was capable of

performing her past work as a sander, she was not disabled.

The ALJ formulated an RFC for Melton, which stated that she had no exertional

limitations, but noted that she does have "significant non-exertional limitations which

interfere with her ability to work."  (Tr. 25.)  Because of her non-exertional limitations,

the ALJ concluded that Melton "cannot maintain frequent and prolonged personal

interaction with both co-workers and the public, cannot sustain a high level of

concentration, such as work requiring sustained precision or attention to detail.  She is

limited to simple routine or repetitive tasks.  She cannot tolerate high stress work, or work

which requires fast paced activity, changing work settings, or explicit production quotas,

deadlines, or schedules."  (Tr. 25.)  The ALJ found that Melton's past work as a sander

did not require skills that exceeded her RFC, but the ALJ did not identify the skills

required to be a sander.

The ALJ also found that Melton's subjective testimony was not credible because of her daily activities and the lack of medical evidence supporting her claim of disability.

## II.    Discussion

### A.    Melton's Credibility

Melton's primary point of contention with respect to the ALJ's credibility analysis is that the ALJ failed to mention all of the credibility factors found in SSR 96-7p, which codifies the findings of *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Those factors are: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See also Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000).

The ALJ need not explicitly discuss each *Polaski* factor. *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors before discounting a claimant's subjective complaints. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).

The ALJ acknowledged the *Polaski* factors and explicitly discussed Melton's daily activities, her medication, and her functional restrictions. Although the ALJ did not explicitly discuss the other factors, the record suggests that he considered them in evaluating Melton's credibility. On remand, the ALJ should make clear whether he in fact has considered all the *Pulaski* factors to avoid future ambiguity.

22

In reaching his conclusion about Melton's credibility, the ALJ relied on the fact that none of Melton's physicians or psychologists stated that she was disabled and none of them found limitations that were consistent with disability. *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability); *Johnson v. Chater*, 108 F.3d 942, 947 (8th Cir. 1997) (inconsistencies in the record as a whole may be basis for discounting claimant's subjective complaints). To the contrary, Dr. Farrow and Worthington jointly stated that Melton could sustain work-related activity as late as March 2003, which is after Melton had submitted her application for benefits.

The ALJ also considered Melton's treatment history. The ALJ noted that Melton's mental limitations improved when she took her medication and when she participated in therapy. The ALJ's determination that Melton's medication improved her condition is supported by substantial evidence in the record. If an impairment can be controlled by medication or treatment, then it cannot be considered disabling. *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004).

The above factors are sufficient to support the ALJ's credibility conclusion.

### B.    Melton's RFC

Melton takes issue with the ALJ's RFC for three reasons: (1) he failed to take into account any physical limitations based on her migraines, which the ALJ found to be severe; (2) the ALJ failed to include a narrative discussion to support his RFC finding in violation of SSR 96-8p; and (3) the ALJ's use of the terms "frequent" and "prolonged"

without definition render the RFC impermissibly vague.

The Court agrees that the ALJ's treatment of Melton's RFC was deficient. The ALJ found Melton's migraines to be severe but did not take them into account when formulating Melton's RFC. Without an explanation for the ALJ's action, the Court cannot properly review the ALJ's decision on this issue. The problem was exacerbated because the ALJ did not include a narrative explaining how the evidence supported the RFC formulation. Nor did he cite to specific facts to support his conclusion. Without such explanations, the Court cannot determine whether there is substantial evidence to support the RFC assigned to Melton by the ALJ.

## C.    Melton's Past Work

Melton also claims that the ALJ violated the requirements of *Groeper v. Sullivan*, 932 F.2d 1234 (8th Cir. 1991), by failing to indicate the requirements of Melton's past work as a sander. Melton correctly notes that the ALJ must make explicit findings regarding the actual physical and mental demands of a claimant's past work and compare the actual demands of the past work with the claimant's RFC. *Pfitzner v. Apfel*, 169 F.3d 566, 568-69 (8th Cir. 1999); *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997); *Salts v. Sullivan*, 958 F.2d 840, 844 (8th Cir. 1992).

In his opinion, the ALJ cited to the Dictionary of Occupational Titles and found that Melton's previous job as a sander required unskilled light exertion tasks. (Tr. 23.) He did not, however, identify the requirements of a sander as required by *Groeper*. This is evident from the fact that at step five of his analysis he identified jobs in the economy

24

that were inconsistent with Melton's RFC. This is not just a matter of nitpicking about how an opinion is written. The regulations and case law require a minimum level of precision to avoid opinions that are conclusory, inconsistent and not subject to rational review.

## III. Conclusion

Accordingly, it is hereby

ORDERED that Melton's Motion for Summary Judgment [Doc. # 7] is GRANTED. The decision of the Commissioner is reversed and remanded. The Court reverses the ALJ's decision and remands for a new determination of Melton's Residual Functional Capacity ("RFC") that takes into account all of Melton's severe impairments, including her migraine headaches, if they are found to be vocationally relevant. If not, the ALJ should explain why. The ALJ is also required to provide a narrative that explains how Melton's medical records or other evidence support the RFC selected by the ALJ. In addition, if the ALJ again concludes that Melton is able to return to her past job as a sander, the ALJ must identify the function by function requirements of a sander to verify that her credible limitations will not prevent her from doing the work of a sander. Finally, if the ALJ, at step five of the evaluation process, concludes that Melton is not disabled, the ALJ must not identify jobs in the economy which have requirements that are inconsistent with Melton's RFC.

s/ Nanette K. Laughrey

25

NANETTE K. LAUGHREY
United States District Judge

DATE: <u>June 20, 2006</u>
Jefferson City, Missouri

26